For Service

DATE _9/17_

TIME _655pm_

INITIALS _(T_

---

DISTRICT COURT
CITY AND COUNTY OF DENVER
STATE OF COLORADO
1437 Bannock Street
Denver, CO 80202
Telephone Number: 720-865-8301

DATE FILED: September 3, 2020 9:37 AM
FILING ID: 8B1A6F46CA78E
CASE NUMBER: 2020CV33048

| | |
|---|---|
| **Plaintiff:** **LAURI ZWINGELBERG AS PERSONAL REPRESENTATIVE OF THE ESTATE OF KENTON LOREN ZWINGELBERG suing derivatively on behalf of SPRINT DENVER, INC., a Texas corporation.**<br><br>v.<br><br>**Defendant:** **ROBERT A. WILLIAMS, a Texas resident.** | ▲ COURT USE ONLY ▲ |
| *Attorneys for Plaintiff, Lauri Zwingelberg, Personal Representative of the Estate of Kenton Loren Zwingelberg, suing derivatively on behalf of Sprint Denver, Inc.:*<br>**Name:** **MOYE WHITE LLP**<br>David A. Laird #31067<br>Rachel E. Yeates #45759<br><br>**Address:** 16 Market Square, 6th Floor<br>1400 16th Street<br>Denver, Colorado  80202-1486<br>**Telephone:** (303) 292-2900<br>**Facsimile:** (303) 292-4510<br>**Email:** David.Laird@moyewhite.com<br>Rachel.Yeates@moyewhite.com | Case Number:<br><br><br><br>Division |

**DISTRICT COURT CIVIL (CV) CASE COVER SHEET FOR INITIAL PLEADING OF COMPLAINT, COUNTERCLAIM, CROSS-CLAIM OR THIRD PARTY COMPLAINT**

1. **This cover sheet shall be filed with each pleading containing an initial claim for relief in every district court civil (CV) case, and shall be served on all parties along with the pleading.** It shall not be filed in Domestic Relations (DR), Probate (PR), Water (CW), Juvenile (JA, JR, JD, JV), or Mental Health (MH) cases. Failure to file this cover sheet is not a jurisdictional defect in the pleading but may result in a clerk's show cause order requiring its filing.

2. **Check one of the following:**

   ☐ This case is governed by C.R.C.P. 16.1 because:

EXHIBIT

A

- The case is not a class action, domestic relations case, juvenile case, mental health case, probate case, water law case, forcible entry and detainer, C.R.C.P. 106, C.R.C.P. 120, or other similar expedited proceeding; *AND*

- A monetary judgment over $100,000 is not sought by any party against any other single party. This amount includes attorney fees, penalties, and punitive damages; it excludes interest and costs, as well as the value of any equitable relief sought.

☑ This case is not governed by C.R.C.P. 16.1 because (check ALL boxes that apply):

☐The case is a class action, domestic relations case, juvenile case, mental health case, probate case, water law case, forcible entry and detainer, C.R.C.P. 106, C.R.C.P. 120, or other similar expedited proceeding.

☑ A monetary judgment over $100,000 is sought by any party against any other single party. This amount includes attorney fees, penalties, and punitive damages; it excludes interest and costs, as well as the value of any equitable relief sought.

☐Another party has previously indicated in a Case Cover Sheet that the simplified procedure under C.R.C.P. 16.1 does not apply to the case.

*NOTE: In any case to which C.R.C.P. 16.1 does not apply, the parties may elect to use the simplified procedure by separately filing a Stipulation to be governed by the rule within 49 days of the at-issue date. See C.R.C.P. 16.1(e). In any case to which C.R.C.P. 16.1 applies, the parties may opt out of the rule by separately filing a Notice to Elect Exclusion (JDF 602) within 35 days of the at-issue date. See C.R.C.P. 16.1(d).*

☐A Stipulation or Notice with respect to C.R.C.P. 16.1 has been separately filed with the Court, indicating:

☐C.R.C.P. 16.1 applies to this case.

☐C.R.C.P. 16.1 does not apply to this case.

**3.** ☑ This party makes a **Jury Demand** at this time and pays the requisite fee. *See* C.R.C.P. 38. (Checking this box is optional.)

Date:  September 3, 2020.                    By: */s/Rachel E. Yeates*
                                             Rachel E. Yeates #45759

| | |
|---|---|
| DISTRICT COURT<br>CITY AND COUNTY OF DENVER<br>STATE OF COLORADO<br>1437 Bannock Street<br>Denver, CO 80202<br><br>Telephone Number: 720-865-8301 | DATE FILED: September 3, 2020 9:37 AM<br>FILING ID: 8B1A6F46CA78E<br>CASE NUMBER: 2020CV33048 |

| | | |
|---|---|---|
| **Plaintiff:** | **LAURI ZWINGELBERG AS PERSONAL REPRESENTATIVE OF THE ESTATE OF KENTON LOREN ZWINGELBERG suing derivatively on behalf of SPRINT DENVER, INC., a** Texas corporation.<br><br>**v.**<br><br>**Defendant:**   **ROBERT A. WILLIAMS**, a Texas resident. | ▲ COURT USE ONLY ▲<br><br>Case Number:<br><br>Div. |
| *Attorneys for Plaintiff, Lauri Zwingelberg, Personal Representative of the Estate of Kenton Loren Zwingelberg, suing derivatively on behalf of Sprint Denver, Inc.:* | | |
| **Name:** | **MOVE WHITE LLP**<br>David A. Laird #31067<br>Rachel E. Yeates #45759 | |
| **Address:**<br><br><br>**Telephone:**<br>**Facsimile:**<br>**Email:** | 16 Market Square, 6th Floor<br>1400 16th Street<br>Denver, Colorado  80202-1486<br>(303) 292-2900<br>(303) 292-4510<br>David.Laird@moyewhite.com<br>Rachel.Yeates@moyewhite.com | |

| |
|---|
| **SUMMONS** |

**TO THE ABOVE-NAMED DEFENDANT:**

    **ROBERT A. WILLIAMS**

**YOU ARE HEREBY SUMMONED** and required to file with the Clerk of this Court an answer or other response to the attached Complaint.  If service of the Summons and Complaint was made upon you within the State of Colorado, you are required to file your answer or other response within 21 days after such service upon you.  If service of the Summons and Complaint was made upon you outside of the State of Colorado, you are required to file your answer or other response within 35 days after such service upon you.  Your answer or counterclaim must be accompanied with the applicable filing fee.

DATED this 3ʳᵈ day of September, 2020.

                                   Respectfully submitted,

                                     **MOYE WHITE LLP**

                                     *Original pleading bearing original signature maintained in the offices of Moye White LLP, as required by C.R.C.P. 121, § 1-26(9)*

                                     By:  *s/ Rachel E. Yeates*
                                         David A. Laird (#31067)
                                         Rachel E. Yeates (#45759)
                                         *Attorneys for Plaintiff*

**This Summons is issued pursuant to Rule 4, C.R.C.P., as amended. A copy of the Complaint must be served with this Summons. This form should not be used where service by publication is desired.**

**WARNING:**  A valid summons may be issued by a lawyer and it need not contain a court case number, the signature of a court officer, or a court seal.  The plaintiff has 14 days from the date this summons was served on you to file the case with the court.  You are responsible for contacting the court to find out whether the case has been filed and obtain the case number.  If the plaintiff files the case within this time, then you must respond as explained in this summons.  If the plaintiff files more than 14 days after the date the summons was served on you, the case may be dismissed upon motion and you may be entitled to seek attorney's fees from the plaintiff.

TO THE CLERK: If the summons is issued by the clerk of the court, the signature block for the clerk or deputy should be provided by stamp, or typewriter, in the space to the left of the attorney's name.

| | |
|---|---|
| DISTRICT COURT<br>CITY AND COUNTY OF DENVER<br>STATE OF COLORADO<br>1437 Bannock Street<br>Denver, CO 80202<br><br>Telephone Number: 720-865-8301 | DATE FILED: September 3, 2020 9:37 AM<br>FILING ID: 8B1A6F46CA78E<br>CASE NUMBER: 2020CV33048 |
| **Plaintiff:**   **LAURI ZWINGELBERG AS**<br>**PERSONAL REPRESENTATIVE OF**<br>**THE ESTATE OF KENTON LOREN**<br>**ZWINGELBERG suing derivatively on**<br>**behalf of SPRINT DENVER, INC., a**<br>Texas corporation.<br><br>**v.**<br><br>**Defendant:**   **ROBERT A. WILLIAMS**, a Texas<br>resident. | ▲ COURT USE ONLY ▲<br><br>Case Number:<br><br>Div. |
| *Attorneys for Plaintiff, Lauri Zwingelberg, Personal*<br>*Representative of the Estate of Kenton Loren Zwingelberg,*<br>*suing derivatively on behalf of Sprint Denver, Inc.:*<br><br>**Name:**   **MOYE WHITE LLP**<br>David A. Laird #31067<br>Rachel E. Yeates #45759<br><br>**Address:**   16 Market Square, 6th Floor<br>1400 16th Street<br>Denver, Colorado  80202-1486<br>**Telephone:**   (303) 292-2900<br>**Facsimile:**   (303) 292-4510<br>**Email:**   David.Laird@moyewhite.com<br>Rachel.Yeates@moyewhite.com | |
| **VERIFIED COMPLAINT** | |

Plaintiff, Lauri Zwingelberg, in her capacity as Personal Representative of the Estate of Kenton Loren Zwingelberg (the "Estate"), by and through her attorneys, **MOYE WHITE, LLP**, brings this Verified Complaint against Defendant, Robert A. Williams ("Williams"), as follows:

## INTRODUCTION

1.      Kenton Zwingelberg ("Kent") was a minority shareholder in Sprint Denver, Inc. ("the Company"). Kent co-founded the Company and served as its president until his death, more than thirty years later. Defendant Williams is currently the president, board chair, and majority shareholder of the Company through his wholly-owned entity, Sprint Fort Worth, Inc. ("Sprint FW"). As an officer of the of the Company and the board director, Williams owed a fiduciary duty to the Company.

2.      As Kent was dying from brain cancer, Williams unilaterally cut his salary, replaced him as president, and took over the Company's operations. Since then, Williams has repeatedly acted against the interests of the Company. Williams laid off nearly half the Company, sold nearly all of its assets without proper due diligence or notice to Kent's estate, used Company money to pay for luxury hotels and expensive dinners for his family and friends, and began paying himself an exorbitant salary to manage an essentially defunct entity. Williams has also failed to seat a board, as required by the Company's governing documents, and has failed to maintain any corporate formalities. Williams has used Company assets to file a baseless and predatory claim against Kent's estate in order to establish a debt the Estate can only pay by relinquishing its stake in the Company.

3.      Williams has stripped the Company of its assets for his personal gain and has refused to return any of the money he has stolen from, or caused the Company to lose, because of his willful mismanagement.

## PARTIES, JURISDICTION, AND VENUE

4.      Kent was a Colorado resident.

5.      Kent held 45% of the shares in the Company.

6.      Kent died on February 1, 2019.

7.      The Estate of Kenton Loren Zwingelberg is being probated in Arapahoe County, Colorado.

8.     Ms. Zwingelberg is the Personal Representative of the Estate. Lauri Zwingelberg brings this action in her capacity as Personal Representative of the Estate.

9.     Ms. Zwingelberg's address is 26030 E. Phillips Place, Aurora, Colorado 80016.

10.    Upon Kent's death, his shares in the Company devolved to the Estate by operation of law.

11.    Williams is a Texas resident who resides at 1143 Roaring Springs Road, Unit DD, Fort Worth, Texas 76114.

12.    Williams is the president and board chair of the Company.

13.    The Company's principal place of business is located at 4999 Kingston Street, Denver, Colorado 80239.

14.    The Company's registered agent in Colorado is currently listed as Kent.

15.    The Company's status with the Colorado Secretary of State is currently delinquent.

16.    Jurisdiction is proper in this Court pursuant to C.R.S. § 13-1-124 because both the Company and Williams transacted business within Colorado and because Williams committed tortious acts in Colorado.

17.    Venue is proper in this Court pursuant to C.R.C.P. 98(c) because the action involves a tort that was committed in Denver County.

## GENERAL ALLEGATIONS

### A. The Zwingelbergs and Williams Establish the Company in Colorado

18.    In the 1980s, Kent, and Kent's wife, Lauri, met Williams while Kent and Lauri were working at her brother-in-law's printing company.

19.    When Kent and Lauri decided to start their own printing business, Williams asked if he could invest in the business as he had been impressed with Kent during their prior interactions.

20.    Williams and Kent established the Company in 1986.

21.    The Company was a printing business that specialized in commercial printing, such as mailers and flyers for businesses like National Geographic, Xcel Energy, and the Denver Art Museum.

22.    Sprint FW owns 55% of the shares in the Company.

3

23.     Sprint FW is wholly owned by Williams, who is also the chairman and director of the Company.[1]

24.     Kent owned the remaining 45% of the shares in the Company.

25.     The Company's headquarters are in Colorado and always have been.

26.     The Company has never had any offices or employees outside Colorado with the exception of a single part-time employee who lived in Texas.

27.     All of the Company's printing equipment, bank accounts, and other assets are and always have been held in Colorado.

28.     The Company has never had any operations outside of Colorado.

## B. Zwingelbergs Grow the Company, Williams Provides Occasional Input

29.     While Williams was a shareholder, officer, and board member of the Company, he had little involvement in running the Company during the more than thirty years it was in operation.

30.     Williams lives in Texas and would call Kent roughly every six months to check in on the Company.

31.     In his role as an officer and board member, Williams traveled to Colorado to visit the Company's headquarters, but he did not contribute to the Company's day-to-day operations.

32.     However, Williams was compensated by the Company, and his pay came from a Colorado bank account.

33.     Williams has served as chairman of the board of the Company since the Company's inception.

34.     Kent also served on the board under Williams' chairmanship.

35.     From the outset of the venture, Kent served as president of the Company, and Williams served as vice president.

36.     However, as the *de facto* majority owner (through Sprint FW), Williams insisted on approving all decisions made on behalf of the Company.

---

[1] Upon information and belief, Sprint FW has no operations and is simply a holding company for Williams' shares in Sprint Denver.

37.     During their twice-yearly calls, Kent would provide an update, raise issues that faced the Company, and consult with Williams on how to proceed.

38.     Williams ratified all major decisions Kent made for the Company.

39.     Kent and Lauri devoted themselves to the Company.

40.     The Zwingelbergs, and eventually their children, established, grew, and operated the business essentially on their own from its inception in 1986 until Kent died in 2019.

41.     Kent was so devoted to the Company he personally guaranteed the Company's yearly line of credit, a commitment Williams always refused to take on despite holding a larger ownership share in the Company.

42.     Under Kent's leadership, the Company grew from having ten employees, including Kent and Lauri, to over one hundred at the time Kent passed away.

43.     While Kent ran the business, Lauri filled in in whatever role the Company needed.

44.     Lauri primarily performed administrative work, handling the Company's payroll and insurance, but Lauri also pitched in in the bindery and other areas of the business as help was needed.

45.     Kent worked at the Company until the day he died.

46.     Lauri worked at the Company until Williams fired her, only a few weeks after Kent died of brain cancer.

47.     Kent and Lauri's two sons, Mark and Matt Zwingelberg, also worked at the Company for nearly two decades.

48.     Matt started working part-time at the business when he was fifteen.

49.     Like his mother, Matt was a jack-of-all trades.

50.     He repaired machinery, helped with the printing process, and assisted his mother with the accounting and estimating processes.

51.     Mark began work at the Company at sixteen.

52.     Mark eventually went on to specialize in sales for the Company.

53.     Over the years, Williams has held an interest in several other printing businesses around the country, all of which failed due to his mismanagement and poor choice in business partners.

54.     Given Williams' minimal involvement in the day-to-day running of the business and his lack of qualifications and experience, after Kent's death Lauri, Mark, and Matt were the three individuals who were best equipped to run the Company.

**C. Kent Becomes Sick, Williams Watches from Afar as the Business Flounders**

55.     Kent began experiencing serious health problems in the summer of 2015.

56.     In August 2017, he suffered a grand mal seizure during a trip to the mountains.

57.     Kent's health was never the same.

58.     He was eventually diagnosed with brain cancer.

59.     Williams was fully aware of Kent's health problems, but he made no effort to assist in the business, despite the fact that he was still drawing a salary from the Company.

60.      Williams also chose not to hire another professional who could help shoulder Kent's considerable duties.

61.     Kent tried to keep the business afloat on his own, despite his failing health.

62.     Ultimately, Kent worked for the Company until his death.

**D. Williams Unilaterally Ousts Kent, Takes Over as President, Fires Essential Employees**

63.     Williams continued to ignore the business and the increasingly apparent need for management assistance until one month before Kent died, by which point Kent had been carrying the burden of running the Company while suffering from brain cancer for over a year.

64.     Shortly before Kent's death, Williams unilaterally removed Kent as president.

65.     Williams did not consult the other board members before doing so.

66.     Williams then appointed himself president – again without board consultation – despite the fact that Williams had little understanding or experience with the Company's everyday operations.

67.     One month before Kent passed away, Williams flew to Colorado and demanded a meeting.

68.     At that meeting, Williams told Kent that he planned on cutting Kent's salary in half and on cutting Lauri's salary completely within the month.

69.    After Lauri found out what Williams had threatened, Kent called Williams with Lauri present on the call and begged Williams to reconsider.

70.    Kent explained that the family had bills to pay and without any income, they would be unable to pay their bills and would have their property repossessed.

71.    Lacking income, some of the Zwingelbergs' possessions were in fact repossessed even as Kent lay dying.

72.    Kent died knowing his wife and family were facing financial ruin because Williams intended to strip him and his wife of the only source of income his family had had in 30+ years.

73.    Kent died on February 1, 2019.

74.    Having no intention of continuing the Company's operations when he could sell its assets and pocket them for himself, Williams began systematically dismantling the institution the Zwingelbergs had created.

75.    Williams fired Lauri around the second week of February 2019, roughly one week after her husband died.

76.    Williams hired a consultant to recommend changes that might keep the Company afloat.

77.    However, Williams ignored nearly all of the consultant's recommendations and instead did everything he could to wind down operations and prepare the Company for a sale.

78.    Williams ordered Kent's son Matt, who regularly serviced the printing machines, to stop all work on the machines. Williams refused to allow any other person to work on the machines either, so when they broke, the machines were left idle and thus unproductive.

79.    In June 2019, Williams laid off nearly half of the Company's employees with almost no notice.

**E. Williams Attempts to Steal from the Company, Zwingelbergs Resign from Board**

80.    After Kent's death, Lauri, Mark, and Matt served on the board of the Company in his stead.

81.     Williams attempted to seat two Company employees on the board as well, but those employees, distrustful of Williams and unsettled by his refusal to obtain insurance for board members, refused.

82.     The Company held a key man insurance on Kent in the amount of $2,000,000.

83.     Some of the policy was paid to the Company while Kent was alive because his condition was terminal.

84.     However, a portion of the policy remained after Kent passed away.

85.     This money should have gone to the Company in order to shore up its balance sheet and to assist with the transition after Kent's passing.

86.     However, after Kent died, Williams insisted that the Company pay the remaining amount on the policy *to him personally*.

87.     When Lauri refused to consent to Williams' proposed misconduct, Williams flew to Colorado along with his attorney and demanded a meeting with Lauri, who was now the Personal Representative of Kent's estate.

88.     While in Colorado, Williams used Company money to put himself, his lawyer, and his daughter, who had no role at the Company whatsoever, up at the Brown Palace Hotel.

89.     They lived lavishly during their stay, improperly expensing everything to the Company.

90.     Williams also called a Board meeting in Colorado, which he attended in person.

91.     At that meeting, Williams conducted business on behalf of the Company, and Williams' actions in that meeting, in part, give rise to this lawsuit.

92.     At the meeting, Williams, his attorney, and his daughter attempted to browbeat Lauri into acquiescing to his theft of corporate assets.

93.     Lauri refused, and Williams left enraged.

94.     Further disputes arose between Williams and the Zwingelbergs regarding Williams' vandalization of the Company.

95.     However, because Williams was chair of the board, the only officer of the Company, and the *de facto* majority owner, the Zwingelbergs were unable to override any of

8

Williams' decisions, even if they had had some small success in convincing him not to steal the key man insurance proceeds from the Company.

96.     Seeing the futility of their service on the Board and unwilling to expose themselves to liability from Williams' poor decisions, the Zwingelbergs resigned in March 2019.

97.     Williams never replaced them, despite the fact that the Company governing documents require three board members at all times.

98.     Currently, Williams is the only officer, one of only two employees (the other is a bookkeeper), and the only board member of the Company.

99.     Williams is thus the sole decision-maker at the Company and is solely responsible for all actions the Company has taken since March 2019.

**F. Williams Liquidates the Company**

100.    In keeping with his plan to dismantle the Company, sell its assets, and keep the profits for himself, Williams decided to sell substantially all of the Company's assets.

101.    However, upon information and belief, Williams did not undertake any robust sales process to find the highest bidder.

102.    Upon information and belief, Williams did not perform adequate due diligence during the sales process.

103.    After her husband's death, Lauri heard through the grapevine that Williams intended to sell the Company's assets.

104.    Lauri told Williams that there was a buyer willing to offer a certain price for the Company's assets.

105.    However, Williams refused to pursue that deal and instead sold the Company's assets to Mittera Colorado, LLC ("Mittera") for a significantly smaller price than he would have received had he sold to the buyer Lauri suggested.

106.    Williams was likely required to obtain shareholder approval before selling all or substantially all of the Company's assets.

107.    However, Williams may not have obtained the appropriate percentage of shareholder approval before he sold the Company's assets.

108.    Williams did make a nominal attempt to obtain approval from the Estate by providing insufficient and misleading information regarding the potential sale.

109.    When the Estate demanded additional information about the sale, Williams refused.

110.    Instead, Williams sent over documentation related to the sale and demanded the Estate sign it. The Estate refused.

111.    Despite the Estate's refusal, Williams went ahead with the sale.

112.    Williams sold substantially all of the Company's assets to Mittera on June 11, 2019.

113.    The Estate only found out that Williams had in fact sold substantially all of the Company's assets after the closing.

114.    Upon information and belief, Mittera failed to pay the Company the agreed-upon payments after the sale, in part because Williams failed to structure the deal in a way that protected the Company.

115.    Upon information and belief, Williams also made inadequate attempts to follow up on the payments Mittera owes the Company.

116.    Further, Williams directed the dismantling of the Company's remaining assets from Texas.

117.    Williams failed to retain anyone with experience to perform the task of liquidating the rest of the Company's assets, and his careless approach lost the Company money.

118.    Williams found buyers for the Company's remaining assets – through an unknown process – and hired a man to move these assets and empty the building.

119.    Since Williams had fired essentially all of the Company's employees, there was no one to oversee this man's work.

120.    Upon information and belief, Williams put no procedures in place to safeguard the Company's remaining assets as this man cleared out the building.

121.    The man was later caught stealing from Mittera.

122.    The Estate believes this man may also have stolen assets from the Company as a result of Williams' failure to supervise him.

### G. Williams Pays Himself an Exorbitant Salary for Doing Essentially Nothing

123.   After the sale of substantially all of the Company's assets, there was little work to be done on behalf of the Company other than some minor administrative tasks.

124.   The Company has no operations and has not had any for some time.

125.   The Company has no employees other than Williams and a bookkeeper.

126.   The Company has no equipment or other concrete assets to operate or sell.

127.   The Company was essentially wound up after the sale to Mittera because, having sold substantially all of its assets, there was no point in the Company continuing its existence.

128.   The only substantive task remaining is for Williams to ensure Mittera continues to pay the Company under the terms of the sale.

129.   Yet, Williams has been paying himself an annual salary of $140,000.

130.   For context, the sale of substantially all of the Company's assets to Mittera consisted of a purchase price of $105,000 and a small percentage of future sales.

131.   Williams did not inform the Estate that he was taking this salary.

132.   The Estate demanded bank records for the Company, and Williams initially resisted producing them.

133.   However, Williams eventually did provide the records.

134.   It was only then that the Estate discovered the amount Williams had been paying himself.

135.   Williams is paying himself an exorbitant salary in order to siphon all of the Company's funds instead of paying the remaining assets to the shareholders, of which the Estate is one.

136.   Williams' salary is patently unreasonable given that there is so little work Williams could possibly do on behalf of the Company.

137.   The salary is doubly unreasonable in light of the fact that Williams has failed to perform the little work that is left to do.

138.   As stated above, Williams may not be exerting his full efforts to ensure Mittera is paying the Company the money owed under the purchase and sale agreement.

11

139.    Further, Williams, as the sole officer and agent of the Company, had a duty to maintain the Company's status with the Colorado Secretary of State.

140.    Williams failed to do so, and as a result, the Company has been delinquent with the Colorado Secretary of State for some time.

141.    Williams has also violated the Bylaws of Sprint Denver, Inc. (the "Bylaws") in myriad ways, including, but not limited to, the following:

a.      There must be at least three board members at all times, but Williams has made no attempt to seat anyone other than himself, in contravention of ¶ 3.02;

b.      Directors must be elected at an annual meeting, but Williams has not held a meeting in over a year, in contravention of ¶ 3.02;

c.      Williams has kept no minutes of any board meeting, in contravention of ¶ 3.13;

d.      Williams removed Kent as president without input from the other board members in place at the time, in contravention of ¶ 6.02;

e.      Williams unilaterally declared himself president of the Company without an election by the board of directors, in contravention of ¶ 6.01(b);

f.      In contravention of ¶ 3.12, Williams compensated himself as a board member without a resolution from the board of directors, as he has failed to seat any other board members as required by ¶ 3.02.

g.      In contravention of ¶ 6.06(a) and (e) and ¶ 6.01(a) and (e), Williams has not appointed a secretary or a treasurer;

h.      In contravention of ¶ 6.05, Williams has compensated himself as president without input from the board of directors, as he has failed to seat two other board members as required by ¶ 3.02;

i.      In contravention of ¶ 8.02, Williams has failed to keep correct and accurate books and records and has failed to keep meeting minutes; and

j.      In contravention of ¶ 8.03, Williams has failed to mail the Estate an annual statement.

142.    Williams has rid the Company of all its other employees and officers, and he has refused to fill the empty seats on the board.

12

143.    In doing so, Williams has arrogated to himself all decision-making authority for the Company, and thus he has raided the Company with impunity and will continue to do so if his actions remain unchecked.

**H. Williams Causes the Company to File a Baseless Lawsuit Against the Estate**

144.    Not content with destroying the Company the Zwingelbergs built and taking their share of the assets for himself, on August 1, 2019, Williams caused the Company to file a baseless claim against the Estate (the "Probate Claim").

145.    The two-sentence Probate Claim asserts that the Company made a $249,026.17 loan to Kent, which Kent did not repay.

146.    The Probate Claims also demands "[d]amages in [e]xcess of $100,000.00" for a variety of reasons, including breach of fiduciary duty, negligence, fraud, self-dealing, and other false allegations.

147.    The Probate Claim is baseless because the Company never made any loan to Kent, and there is and has never been any documentation supporting such a loan.

148.    The Probate's other tort allegations are similarly baseless as Williams was fully aware of and approved of all of Kent's decisions with respect to the Company.

149.    As further evidence of this, upon information and belief, the amount of the alleged loan made to Kent is the exact amount of the proceeds that was left in the key man insurance policy, which Lauri refused to have paid to Williams in his personal capacity.

150.    Thus, Williams ratified all of Kent's decisions.

151.    Since Kent's death, Lauri has repeatedly objected to Williams' violation of the Company's Bylaws and to his self-dealing.

152.    The Probate Claim is a naked attempt by Williams to browbeat Lauri into acquiescing to his theft from the business in which the Estate owns an interest.

153.    Put another way, Williams has manufactured wrongdoing out of whole cloth in the hope that he can make the Estate liable to the Company, and then force the Estate to pay its debt by relinquishing its rights to whatever remains of the Company's assets after Williams has finished draining them.

**I. The Estate's Attempts to Protect the Company from Williams**

154.   Claims that have accrued against Williams include breach of fiduciary duty, civil theft, and unjust enrichment.

155.   Williams has caused the Company not to enforce its claims against him, which could properly be asserted by the Company.

156.   Kent was a shareholder during the time of some of Williams' wrongdoing.

157.   The Estate, to which Kent's interest in the Company devolved, has been a shareholder during the rest of Williams' wrongdoing.

158.   The Estate made several efforts to curb Williams' wrongdoing.

159.   For example, on April 30, 2020, counsel for Lauri demanded information regarding Williams' exorbitant salary, exorbitant legal fees incurred, the status of the key man life insurance payments, and other information.

160.   Counsel for Williams did not respond to this demand in full.

161.   On May 6, 2020, counsel for Lauri informed counsel for Williams that Williams' salary was excessive and demanded it be lowered.

162.   Counsel for Lauri also asserted Williams' attorneys' fees were excessive and demanded an accounting for them.

163.   Counsel for Lauri also emphasized that Williams was acting in a fiduciary capacity and owed Company shareholders an accounting and a final distribution of assets.

164.   Williams refused to lower his salary.

165.   Instead, Williams' attorney recommended a shareholder meeting to vote on the issue.

166.   However, the Bylaws do not permit shareholders to authorize compensation, as Williams' counsel well knew, so this offer was not made in good faith.

167.   Williams also refused to commit to make *any* distribution to the Estate.

168.   Instead, Williams asserted he would "allocate the funds…in a manner that he feels is allowed by his position with the Company."

169.   His counsel further refused to substantiate his billing.

170. On May 19, 2020, counsel for Lauri again demanded Williams lower his salary: "I again implore you to have Bob as a director cease to use the payment of his compensation as president as a means to use up a substantial proportion of the earnings of the Company so as to deprive other shareholders of reasonable distributions.

171. Counsel for Lauri also demanded copies of legal fees as business records.

172. On June 12, 2020, Williams' counsel responded, again refusing to lower Williams' salary or to provide the legal bills, even in redacted form.[2]

173. Williams' counsel further threatened to assert "counter and third party [sic] claims" against Lauri and her family should Lauri attempt to exercise her right to sue on the Company's behalf.

174. Williams' counsel also absurdly stated that Williams would not provide a copy of the Company's business records unless the Estate provided a copy of the legal bills incurred in its defense against the Probate Claim.

175. Essentially, Williams conditioned performing his duties under the Bylaws on being able to read the Estate's attorneys' time entries.

176. Thus, the Estate was unable to obtain the actions it sought because Williams refused.

177. Additionally, there are no other board members, directors, or employees on whom the Estate can prevail to support its attempts to curb Williams' wrongdoing.

178. Further efforts would be futile, so the Estate had no recourse other than to file this lawsuit.

179. The Company has only two shareholders: the Estate and Sprint FW, Williams' wholly owned company that holds Williams' shares.

180. Upon information and belief, Sprint FW is an alter ego of Williams.

181. Given that Williams is the sole owner of Sprint FW, demands upon Sprint FW, to the extent they could be considered necessary, were likewise futile.

---

[2] Counsel's email misleadingly states that it is "subject to Colorado and Federal Rule of Evidence 408." However, nothing in the email can be construed as an attempt to furnish, offer, or promise to furnish any valuable consideration to compromise a claim, nor can it be construed as a compromise negotiation. Thus, it is subject to neither rule of evidence. Instead, the email denies the Estate's right to information and threatens to sue it.

182.    The Estate, as the only other shareholder, fairly and adequately represents the interests of the shareholders similarly situated in enforcing the Company's rights.

183.    Therefore, this lawsuit complies with the requirements of C.R.C.P. 23.1.

## FIRST CLAIM FOR RELIEF
### (Breach of Fiduciary Duty)

184.    Plaintiff incorporates by reference the foregoing allegations.

185.    As an officer and director of the board of the Company, Williams was acting a fiduciary of the Company with respect to the Company's interests.

186.    Williams breached his fiduciary duty to the Estate by, among other things, taking the following actions:

a.    Replacing Kent as president without Board input;

b.    Dismantling the Company without shareholder input and failing to safeguard its assets;

c.    Failing to perform adequate due diligence before selling substantially all of the Company's assets;

d.    Failing to ensure the Company was paid in full after the sale of its assets;

e.    Failing to seat at least three board members;

f.    Failing to appoint a secretary or treasurer;

g.    Failing to hold an annual meeting;

h.    Failing to keep meeting minutes;

i.    Failing to keep correct and accurate books and records;

j.    Failing to mail the Estate an annual statement;

k.    Failing to maintain other corporate formalities as required by the Company's Bylaws;

l.    Usurping all decision-making authority in violation of the Bylaws;

m.    Installing himself as president without an election by the board of directors;

n.    Failing to maintain the Company's registration with the Colorado Secretary of State;

o.    Incurring attorneys' fees by baselessly suing the Estate;

16

p.      Improperly using Company assets to pay for family vacations;

q.      Paying himself an exorbitant salary to "manage" a company that is essentially defunct; and

r.      Compensating himself without a resolution of the board.

187.    Williams' breaches of fiduciary duty have caused the Company damages in an amount to be proven at trial.

## SECOND CLAIM FOR RELIEF
### (Civil Theft)

188.    Plaintiff incorporates by reference the foregoing allegations.

189.    Williams knowingly obtained control over the Company's assets when he paid himself a salary and expensed personal and family expenses to the Company.

190.    Williams obtained control over the assets without authorization because:

a.      The Bylaws require board approval of his compensation;

b.      There is no board to approve his compensation; and

c.      The reason there is no board to approve his compensation is because Williams refused to seat one.

191.    Williams obtained control over the assets by deception when he began paying himself but failed to inform the Estate and refused to turn over bank records that showed the payments.

192.    Williams intends to permanently deprive the Company of these assets.

193.    Pursuant to C.R.S. § 18-4-401, Williams committed theft against the Company.

194.    Pursuant to C.R.S. § 18-4-405, the Company is entitled to three times the amount of actual damages it sustained as well as its costs and attorneys' fees.

## THIRD CLAIM FOR RELIEF
### (Conversion)

195.    Plaintiff incorporates by reference the foregoing allegations.

196.    Williams exerted dominion or ownership over property that belonged to the Company when he paid himself an exorbitant and unauthorized salary and when he paid family vacation expenses with Company money.

17

197.   Williams' dominion or ownership over the Company's property was unauthorized.

198.   Williams knew at the time he exerted dominion or ownership over the Company's property that he did not have authorization to do so.

199.   As a result of Williams' conversion, the Company has suffered damages in an amount to be proven at trial.

## FOURTH CLAIM FOR RELIEF
### (Unjust Enrichment)

200.   Plaintiff incorporates by reference the foregoing allegations.

201.   Williams obtained a benefit by, *inter alia*, paying himself an exorbitant salary.

202.   This benefit came at the Company's expense.

203.   The circumstances are such that it would be unjust for Williams to retain the benefit without compensating the Company.

WHEREFORE, Plaintiff, Lauri Zwingelberg, as Personal Representative of the Estate of Kenton Loren Zwingelberg, respectfully requests that this Court enter judgment in her favor, granting the following relief against Defendant, Robert Williams:

A.   Damages according to proof at trial, including treble damages for civil theft;

B.   Costs, expenses, and attorneys' fees;

C.   Pre- and post-judgment interest; and

D.   Such other and further relief as this Court deems just and proper.

DATED this 3rd day of September, 2020.

Respectfully submitted,
**MOYE WHITE LLP**
*Original pleading bearing original signature maintained in the offices of Moye White LLP, as required by C.R.C.P. 121, § 1-26(9)*

By:_*s/ Rachel E. Yeates*_____
David A. Laird (#31067)
Rachel E. Yeates (#45759)
*Attorneys for Plaintiff*

**Plaintiff's Address**
26030 E. Phillips Place
Aurora, Colorado 80016

19

I, Lauri Zwingelberg, Personal Representative of the Estate of Kenton Loren Zwingelberg, state under oath, that I am of lawful age and have authority to execute this Verification on behalf of the Estate of Kenton Loren Zwingelberg. I have read the above **VERIFIED COMPLAINT,** know the factual content thereof, and state under penalty of perjury that the facts therein are true and correct to best of my knowledge and that the attached documents are true and correct copies.

THE ESTATE OF KENTON LOREN
ZWINGELBERG

By:
Name: Lauri Zwingelberg
Title: Personal Representative

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy or validity of that document.

**STATE OF COLORADO**

) SS

**COUNTY OF** Arapahoe )

On September 1, 2020 before me, Meagan Scott, personally appeared Lauri Zwingelberg, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her authorized capacity, and that by her signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of Colorado that the foregoing paragraph is true and correct.

**WITNESS my hand and official seal.**

**Signature**

MEAGAN M SCOTT
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20164013772
MY COMMISSION EXPIRES APRIL 11, 2024